# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Bennett, Brad Wilde, and David Statton, individually and as representatives of a class of similarly situated persons, | Case No. 0:24-cv-00546-JMB-SGE |
| Plaintiffs, | |
| v. | |
| Ecolab, Inc., the Plan Administrator of the Ecolab Pension Plan, and the Ecolab Pension Plan, | |
| Defendants. | |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 4

ARGUMENT ...................................................................................................... 8

    I.   Plaintiffs Bennett and Wilde Have Suffered Article III Injury........................... 8

       A. Rule 12(b)(1) Legal Standard.................................................................... 8

       B. Bennett and Wilde Have Standing Because They Have Not Received Their Full Pension Benefits...................................................................... 9

       C. ERISA Requires that a JSA Must Be Actuarially Equivalent to an SLA Commencing as of the Same Date ............................................. 11

       D. The Early Retirement Factor Is ERISA Compliant and Not Challenged Here ................................................................................... 16

       E. The Experts Agree: The JSA Factors Used to Calculate Plaintiffs' JSAs Resulted in Monthly Pension Payments that Are Less Than the Minimum ERISA Requires .......................................................... 21

    II.  The SAC Properly Alleges ERISA Violations ................................................ 22

       A. Rule 12(b)(6) Legal Standard................................................................. 22

       B. The SAC Plausibly Alleges that Defendants Violated Sections 1053, 1054, and 1055 by Using Outdated Actuarial Assumptions to Calculate Statton's JSA Benefit................................................................. 22

       C. Plaintiffs' Breach of Fiduciary Duty Claims Challenge Fiduciary Conduct ............................................................................................. 27

       D. Count IV is Timely................................................................................. 33

CONCLUSION ................................................................................................ 38

## <u>TABLE OF AUTHORITITES</u>

**Cases**

*Adams v. U.S. Bancorp*,
635 F. Supp. 3d 742 (D. Minn. 2022) ........................................................ 22

*Agredano v. State Farm Lloyds*,
975 F.3d 504 (5th Cir. 2020) ................................................................. 23

*Atkins v. Nw. Airlines, Inc.*,
967 F.2d 1197 (8th Cir. 1992) ............................................................... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................... 22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................... 22

*Boggs v. Boggs*,
520 U.S. 833 (1997) ......................................................................... 13

*Braden v. Wal-Mart Stores, Inc.*,
558 F.3d 585 (8th Cir. 2009) ............................................................... 22

*Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
582 U.S. 497 (2017) ......................................................................... 34

*Cattin v. Gen. Motors Corp.*,
955 F.2d 416 (6th Cir. 1992) ............................................................... 16

*Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*,
387 F. Supp. 2d 175 (E.D.N.Y. 2005)
*aff'd*, 199 F. App'x 29 (2d Cir. 2006) ...................................................... 32

*Cent. Laborers' Pension Fund v. Heinz*,
541 U.S. 739 (2004) .....................................................................17, 18

*Christensen v. Qwest Pension Plan*,
462 F.3d 913 (8th Cir. 2006) ............................................................... 31

*Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of Am., Inc.*,
2012 WL 5439170 (D. Minn. Nov. 7, 2012) ................................................. 23

*Cruz-Arce v. Mgmt. Admin. Servs. Corp.*,
19 F.4th 538 (1st Cir. 2021) .................................................................... 23

*Dawson-Murdock v. Nat'l Counseling Grp., Inc.*,
931 F.3d 269 (4th Cir. 2019) ............................................................ 28, 29

*Delker v. MasterCard Int'l, Inc.*,
21 F.4th 1019 (8th Cir. 2022) ................................................................ 33

*Engers v. AT&T*,
2002 WL 32159586 (D.N.J. Oct. 17, 2002) ........................................... 16

*Engh v. SmithKline Beecham Corp.*,
2007 WL 4179361 (D. Minn. Nov. 20, 2007) ......................................... 36

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ................................................................................ 32

*FirsTier Bank, N.A. v. Zeller*,
16 F.3d 907 (8th Cir. 1994) .................................................................... 30

*Franklin v. Duke Univ.*,
2024 WL 1740479 (M.D.N.C. Apr. 23, 2024) ......................................... 32

*Frye v. Hamilton Cnty. Hosp.*,
2018 WL 11228546 (N.D. Iowa Nov. 1, 2018) ........................................ 23

*Hamrick v. E.I. du Pont de Nemours & Co.*,
2024 WL 359240 (D. Del. Jan. 31, 2024)
*report and recommendation adopted*, 2024 WL 2817966 (D. Del. June 3, 2024) ..... 22

*Herndon v. Huntington Ingalls Indus., Inc.*,
2020 WL 3053465 (E.D. Va. Feb. 20, 2020) ........................................... 22

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ................................................................................ 36

*In re Atlas Van Lines, Inc.*,
209 F.3d 1064 (8th Cir. 2000) ................................................................ 35

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
305 F. Supp. 2d 658 (E.D. Tex. 2004) .................................................... 29

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) ................................................................................ 36

*IT Corp. v. Gen. Am. Life Ins. Co.*,
    107 F.3d 1415 (9th Cir. 1997) ................................................. 30

*Knapp v. City of Columbus*,
    93 F. App'x 718 (6th Cir. 2004) .............................................. 23

*Kuper v. Iovenko*,
    66 F.3d 1447 (6th Cir. 1995) .............................................31, 32

*Masten v. Metro Life Ins. Co.,*
    543 F. Supp. 3d 25 (S.D.N.Y. 2021).......................................... 22

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
    811 F.3d 998 (8th Cir. 2016) ................................................. 29

*McCorkle v. Bank of Am. Corp.*,
    688 F.3d 164 (4th Cir. 2012) ................................................. 32

*McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*,
    2011 WL 4455994 (D.N.J. Sept. 23, 2011) ................................. 33

*McManus v. Clorox Co.*,
    2025 WL 732087 (N.D. Cal. Mar. 3, 2025)................................... 31

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993).......................................................27, 28

*Mitchell v. Blue Cross Blue Shield of N. Dakota*,
    953 F.3d 529 (8th Cir. 2020) ................................................... 9

*Morin v. Essentia Health*,
    2017 WL 4083133 (D. Minn. Sept. 14, 2017) .............................. 35

*Moss v. United States*,
    895 F.3d 1091 (8th Circ 2018).................................................. 8

*Nelsen v. Principal Global Investors Tr. Co.*,
    362 F. Supp. 3d 627 (S.D. Iowa 2019) ..................................... 28

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)........................................................... 29

*Pender v. Bank of Am. Corp.*,
    756 F. Supp. 2d 694 (W.D.N.C. 2010) ..................................... 32

*Plubell v. Merck & Co.*,
    434 F.3d 1070 (8th Cir. 2006) ............................................................36, 38

*Police & Fire Ret. Sys. Of City of Detroit v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013).............................................................. 37

*Randall v. GreatBanc Tr. Co.*,
    2024 WL 713997 (D. Minn. Feb. 21, 2024) ........................... 8, 33

*Reich v. Valley Nat. Bank of Arizona*,
    837 F. Supp. 1259 (S.D.N.Y. 1993).................................................... 5

*Royal Canin U. S. A., Inc. v. Wullschleger*,
    604 U.S. 22, 35 (2025) ................................................................ 18

*Ryan v. Blackwell*,
    979 F.3d 519 (6th Cir. 2020) ...................................................... 23

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
    12 F.4th 337 (3d Cir. 2021) ........................................................ 37

*Slabaugh v. Beurmann-Marshall Corp.*,
    1988 WL 796658 (W.D. Mich. May 31, 1988) ............................ 30

*Smith v. Rockwell Automation, Inc.*,
    438 F. Supp. 3d 912 (E.D. Wis. 2020)......................................... 22

*Smith v. U.S. Bancorp*,
    2019 WL 2644204 (D. Minn. June 27, 2019)....................... 16, 22

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................... 8

*Stanton v. Elliott*,
    25 F.4th 227 (4th Cir. 2022) ...................................................... 23

*Su v. BCBSM, Inc.*,
    2024 WL 3904715 (D. Minn. Aug. 22, 2024) ......................28, 30

*Thole v. U.S. Bank, N.A.*,
    873 F.3d 617 (8th Cir. 2017)
    aff'd 590 U.S. 538 (2020) ..............................................9, 16, 21

*Thorne v. U.S. Bancorp*,
    2021 WL 1977126 (D. Minn. May 18, 2021)............................. 16

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015) ........................................................................... 34, 35

*Tilley v. Mead Corp.*,
    927 F.2d 756, 757 (4th Cir. 1991) ............................................................. 16

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011) ................................................................................ 14

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.*,
    2022 WL 16925963 (N.D. Cal. Nov. 14, 2022) ........................................... 37

*Urlaub v. CITGO Petroleum Corp.*,
    2022 WL 523129 (N.D. Ill. Feb. 22, 2022) ....................................... *passim*

*Urlaub v. CITGO Petroleum Corp.*,
    750 F. Supp. 3d 863, 876-77 (N.D. Ill. 2024) ............................................. 27

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ............................................................................ 31, 33

*Wallace v. ConAgra Foods, Inc.*,
    774 F.3d 1025 (8th Cir. 2014) .................................................................... 8

*White v. Aetna Inc.*,
    2017 WL 11633693 (C.D. Cal. Oct. 18, 2017) ............................................ 31

*Wildman v. Am. Century Servs., LLC*,
    237 F. Supp. 3d 918 (W.D. Mo. 2017) .................................................. 33, 34

*Zavala v. Kruse*,
    2023 WL 2387513 (E.D. Cal. Mar. 7, 2023) ............................................... 36

**Statutes**

26 C.F.R. § 1.401(a)-11(b)(2) ........................................................................ 12

26 C.F.R. § 1.401(a)-20 .................................................................... 11, 12, 13

26 C.F.R. § 1.411(a)-4(a) .............................................................................. 26

29 U.S.C. § 1002(21)(A) ............................................................................... 28

29 U.S.C. § 1002(21)(A)(i) ............................................................................ 30

29 U.S.C. § 1002(23) .................................................................................... 14

29 U.S.C. § 1053(a) ................................................................................... 21, 26

29 U.S.C. § 1054(c)(3) .................................................................................... 25

29 U.S.C. § 1055(a)-(d) ................................................................................... 21

29 U.S.C. § 1055(a)(1) ...................................................................................... 4

29 U.S.C. § 1055(c)(1)(A) ................................................................................. 4

29 U.S.C. § 1055(d) ..................................................................................... 6, 25

29 U.S.C. § 1055(d)(1) .................................................................................... 11

29 U.S.C. § 1055(d)(1)(A) ........................................................................... 4, 11

29 U.S.C. § 1055(d)(1)(B) ................................................................... 4, 9, 11, 12

29 U.S.C. § 1055(d)(2)(A)(i) ........................................................................ 4, 12

29 U.S.C. § 1055(d)(2)(A)(ii) ................................................................... 4, 9, 12

29 U.S.C. § 1102(a) ........................................................................................ 27

29 U.S.C. § 1104(a)(1)(D) ............................................................................... 10

29 U.S.C. 1113(1) ........................................................................................... 33

**Other Authorities**

Fed. R. Civ. P. 8(d)(1) .................................................................................... 23

Fed. R. Civ. P. 8(e) ......................................................................................... 23

**INTRODUCTION**

Plaintiffs, on behalf of a class of married Ecolab employees, brought this lawsuit because Ecolab imposes a penalty on its married employees. Ecolab does so by paying less valuable retirement benefits to married employees than the benefits it pays to single employees. This violates ERISA's requirement that the joint-and-survivor benefits paid to married participants be of the same value as the single-life benefits paid to single employees.

Taking the Complaint's allegations as true, there is no dispute that Ecolab underpays married participants. Defendants' expert, Lawrence Sher, demonstrates this disparity through his calculations. As shown in the chart below, the conversion factor used by Ecolab to convert a single-life annuity ("SLA") to a joint-and-survivor annuity ("JSA") is less than the conversion factor that would be applied under a reasonable set of actuarial assumptions set forth in the Complaint:

| | | Using Plan's Actuarial Factors | Using 417(e) Assumptions |
|---|---|---|---|
| | Bennett's Accrued Benefit (Age 65 SLA) | $2,068.70 | $2,068.70 |
| **Step 2** | **Adjustment for 100% J&S Payment Form** | | |
| 2a | 100% JSA Factor | 0.9140 | 0.9353 |

1

ECF No. 125, Sher Decl. at 6.[1] Obviously, regardless of the value of the SLA benefit, multiplying it by a smaller conversion factor (in the example above, 0.9140 vs. 0.9353) will result in a smaller JSA benefit.

The reason for this disparity is also plain. Consistent with the terms of the Plan (but *in*consistent with ERISA), Ecolab uses outdated mortality data from the late 1960s when it converts an SLA to a JSA. Because, on average, people live much longer today than in the 1960s, these outdated mortality tables shortchange participants in the SLA-to-JSA-conversion process. The actuarial assumptions should be updated to reflect current reality, and when those assumptions are updated, married participants receiving a JSA will receive higher payments.

Ecolab applies these unreasonable conversion factors to all types of JSA benefits a participant may receive, including age 65, early, optional, and disability. In doing so, Ecolab creates a marriage penalty for every type of retirement benefit available under the Plan because, in every case, Ecolab converts an SLA benefit to a JSA benefit using an unreasonable JSA conversion factor, resulting in a JSA benefit that is less than the actuarial equivalent of the participant's SLA benefit. To be very clear: Plaintiffs do not challenge the calculation of the SLA benefit for those who retire at exactly age 65 to the day, at age 70, early (at age 58 for instance), due to disability, or at any other point in time. Instead, Plaintiffs challenge the way in which the SLA (whether at age 65, early, disability, etc.) is

_____

[1] Citations to particular pages of previously filed documents use the ECF pagination, while citations to particular pages of this memorandum and documents filed contemporaneously with this memorandum use the document's internal pagination.

converted into a JSA for married participants. So, if an age 65 SLA pays $1,000 a month and the unreasonable JSA conversion factor Ecolab uses is 0.92, while a reasonable JSA conversion factor would be 0.94, then the married participant is harmed by the lower multiplier. If an early retirement SLA under the terms of the Plan is $800 a month, the lower multiplier harms the married participant. The same is true for a disability retirement of $750 a month or an age 70 retirement of $1,100 a month. The marriage conversion penalty affects all JSA benefits under the Plan and is unlawful.

Lacking a defense to this unlawful practice on the merits, Defendants resort to misdirection. Indeed, Defendants take the extraordinary step of making hypothetical changes to certain types of benefits that are available under the Plan *that are not at issue or disputed in this lawsuit*, specifically early retirement benefits. Rather than engage with the stark fact that Ecolab is using outdated actuarial assumptions to calculate JSAs for all types of retirement benefits, Defendants instead alter the unchallenged early retirement SLA calculation by using less generous actuarial factors *than are contained in the Plan.* They simply lower the early retirement benefit to suggest that a higher JSA conversion factor for married participants would hurt early retirees. But that would only be true if Ecolab changed the unchallenged early retirement calculation of an SLA.

Defendants engage in this misdirection in challenging the standing of two of the named plaintiffs (but not the third). To do so, they focus myopically, and without reference to the overall structure of the statute, on one definition of "accrued benefit." But Plaintiffs are not suing for any particular benefit or accrued benefit. They are not suing because any SLA benefits under the Plan are illegal or actuarially suspect in calculation. They are suing

3

because an Ecolab employee who chooses any type of JSA is penalized, as their JSA benefit is not actuarially equivalent to the SLA form of the same benefit. If you take the early retirement factor out of it, and simply compare the JSA to the SLA, it is plain that married participants are penalized. *See* Altman Decl. ¶ 19 (calculating Statton's benefits). As the only Court that has addressed this particular issue noted, ERISA does not allow a marriage penalty for any benefit. *Urlaub v. CITGO Petroleum Corp.*, 2022 WL 523129 at *5-6 (N.D. Ill. Feb. 22, 2022). Defendants' motion should be denied.

## BACKGROUND

ERISA requires that, "in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity." 29 U.S.C. § 1055(a)(1). A qualified joint and survivor annuity ("QJSA") means an annuity "for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse." 29 U.S.C. § 1055(d)(1)(A). ERISA also requires a plan to allow participants to waive the QJSA form of the benefit and elect a qualified optional survivor annuity. 29 U.S.C. § 1055(c)(1)(A). A qualified optional survivor annuity ("QOSA") means an annuity "for the life of the participant with a survivor annuity for the life of the spouse which is equal to the applicable percentage of the amount of the annuity which is payable during the joint lives of the participant and the spouse." 29 U.S.C. § 1055(d)(2)(A)(i). Both the QJSA and QOSA must be the "the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B), (d)(2)(A)(ii).

4

Plaintiffs Scott Bennett, Brad Wilde, and David Statton are former Ecolab employees who have retired from lengthy careers at the company. ECF No. 114, Second Amended Complaint ("SAC") at ¶¶ 2, 27-29. As part of the compensation they earned during their employment, Plaintiffs are entitled to retirement benefits under Article 4 of Ecolab's defined-benefit retirement plan, the Ecolab Pension Plan ("Plan").[2] *Id.* The "normal retirement benefit" that they have earned is a monthly pension payment up until their death. ECF No. 121-4, Ecolab Pension Plan, 2017 Revision ("2017 Plan") § 4.2(A).[3] This form of pension benefit, which covers the life of a single person, is called a single-life annuity or "SLA." SAC ¶¶ 3, 57. Under the Plan, the monthly amount of the normal retirement benefit is calculated using a formula that accounts for a participant's years of service with the company and their average compensation. 2017 Plan § 4.3(A). Participants may retire and begin receiving their normal retirement benefit after reaching age 65 and completing at least five years of continuous service. *Id.* Art. 2 (defining "Normal Retirement Date") and § 4.2(A).

Several features of the Plan provide participants with the option to receive their benefit at different times and in different forms than the SLA form of the normal retirement

---

[2] A pension plan is "part of the overall benefits and compensation package offered to employees who participated in the [p]lan. Employee benefits are not a mere gratuity, but a form of deferred wages." *Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1286-87 (S.D.N.Y. 1993) (citation omitted).

[3] Defendants filed both the 2012 and 2017 versions of the Plan document. *See* ECF No. 121-3 and ECF No. 121-4. Where the provisions relevant to this motion are not meaningfully different between the two, and for ease of reference, only the 2017 version is cited herein. Where the provisions relevant to this motion differ, both the 2012 and 2017 versions are cited.

benefit. For example, under certain circumstances participants may retire as early as age 55, in which case the amount of their monthly benefit is decreased by 1/280th per month for each month that they receive benefits prior to age 62. 2017 Plan § 4.5(D). As another example, by default married participants will have their normal retirement benefit SLA converted to a joint-and-survivor annuity or "JSA," which provides a benefit for the lifetime of the participant *plus* the lifetime of the participant's surviving spouse. 2017 Plan Art. 7. Each Plaintiff elected to receive his benefits in the form of a JSA that was a QJSA under ERISA. SAC ¶¶ 27-29; 29 U.S.C. § 1055(d).

The conversion from an SLA to a JSA is complicated. It involves a calculation of the total value of monthly SLA payments over the expected lifetime of the participant, based on statistics related to average lifespans, and then the calculation of a monthly benefit amount that redistributes the total value of the SLA over the expected lifetimes of two people, typically a longer period of time involving a greater number of months in which benefits are paid. SAC ¶¶ 5-8. When the calculations are performed correctly, the two forms of benefit payments will have the same present economic value; in other words, the two are "actuarially equivalent." *Id.* at ¶ 8.

When converting the value of an SLA earned under Article 4 of the Plan to a JSA, Defendants systematically underpay retirees and their spouses who receive JSA benefits. *Id.* at ¶¶ 62-71. This is because the mathematical formulas used to calculate the SLA-to-JSA conversion rely, in part, on data regarding average lifespans. *Id.* at ¶ 8. The longer a participant is expected to live post-retirement, the greater the number of monthly annuity payments they would be entitled to collect under an SLA, which increases the overall value

6

of their earned benefit. But when Defendants perform the JSA conversion, they value the SLA using obsolete mortality data collected in the 1960s that does not accurately reflect the significant increases in average lifespans for Americans in the last sixty years. *Id.* at ¶¶ 11-12, 62-64. This results in a "marriage penalty," meaning the value of the benefit Defendants pay to married participants and their spouses under a JSA is far less than equivalent to the value of the SLA benefit that those participants have earned. *Id.* at ¶¶ 66-71.

Defendants know that the mortality data used to convert an Article 4 SLA to a JSA is outdated. *Id.* at ¶¶ 13-16. For example, benefits earned under Article 5 of the Plan — which applies to employees who became participants after January 1, 2003, and for all participants after December 31, 2020 — are calculated using routinely updated mortality tables. *Id.*; *see also* 2017 Plan, Schedule B, § A (identifying different mortality schedules for actuarial equivalencies related to Article 4 and Article 5 benefits). Indeed, other calculations that require the use of actuarial assumptions, including benefits under Article 5, calculating minimum funding amounts, and lump sum payments, are performed using updated mortality tables that assume significantly greater longevity than the actuarial assumptions used to convert SLAs earned under Article 4 to JSAs. SAC ¶¶ 76-80.

Plaintiffs bring this lawsuit to remedy the systematic underpayment of their earned pension benefits. And, because Defendants apply the SLA-to-JSA conversion formulas uniformly to all participants who have earned benefits under Article 4 of the Plan, Plaintiffs seek to represent a class of similarly situated participants who have suffered the same injuries. Among other things, Plaintiffs allege that Defendants' use of outdated mortality

tables results in violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 *et seq.*, specifically ERISA's joint-and-survivor-annuity requirements, 29 U.S.C. § 1055; actuarial-equivalence requirements, 29 U.S.C. § 1054; and anti-forfeiture rules, 29 U.S.C. § 1053; as well as a breach of fiduciary duty on the part of the Plan Administrator, 29 U.S.C. § 1104.

## ARGUMENT

### I.    PLAINTIFFS BENNETT AND WILDE HAVE SUFFERED ARTICLE III INJURY

#### A.    Rule 12(b)(1) Legal Standard

A Rule 12(b)(1) motion may raise either a facial or factual attack on jurisdiction. *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). Because Defendants bring a factual attack, this Court "considers matters outside the pleadings and resolves disputed facts, applying no presumption of truth to the non-moving party's allegations or evidence (or, for that matter, to the moving party's evidence)." *Randall v. GreatBanc Tr. Co.*, 2024 WL 713997, at *3 (D. Minn. Feb. 21, 2024).

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations and quotations omitted). Monetary or economic harms, "even if only a few pennies," satisfy this standard. *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014).

**B.    Bennett and Wilde Have Standing Because They Have Not Received Their Full Pension Benefits**

Under ERISA, a "qualified" joint and survivor annuity must be the "actuarial equivalent of a single life annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B). Plaintiffs Bennett and Wilde have suffered an injury in fact because their JSA payments are less than the actuarial equivalent of the SLA payments they are entitled to under ERISA. They receive less money every month on account of Defendants' failure to use reasonable actuarial assumptions to determine an actuarially equivalent benefit "for the life of the participant." 29 U.S.C. §§ 1055(d)(1)(B), (d)(2)(A)(ii). This is a concrete injury in fact sufficient to confer Article III standing. *See Thole v. U. S. Bank N.A.*, 590 U.S. 538, 542 (2020) ("If Thole and Smith had not received their vested pension benefits, they would of course have Article III standing to sue…."); *Mitchell v. Blue Cross Blue Shield of N. Dakota*, 953 F.3d 529, 536 (8th Cir. 2020) ("the denial of plan benefits constitutes a cognizable injury in fact for purposes of constitutional standing").

To avoid the conclusion that Plaintiffs have been injured, Defendants rely on two faulty premises. The first is a misapprehension of the term "accrued benefit" and its application in ERISA, which according to Defendants' logic would mean that a participant's pension benefit is not subject to the actuarial equivalence requirement unless they retire precisely at what Defendants refer to as the "normal retirement age" of 65.[4]

---

[4] Defendants read all references to the "accrued benefit" in ERISA to mean only the annual benefit commencing at normal retirement age, *i.e.* the age 65 SLA. ECF No. 120, *Defs' Memo.* at 15-17. However, ERISA is not so clear. For example, section 1054(c)(3) states, "if an employee's accrued benefit is to be determined as an amount other than an annual

Under this reading, those who elect late or early retirement or disability or other retirements allowed under the terms of the Plan are not entitled to a marriage benefit (a JSA) that is actuarially equivalent to the SLA benefit they would receive at that time. Only those who retire precisely at age 65 would receive the protection of actuarial equivalence in the SLA-to-JSA conversion for their chosen benefit under the Plan, and the remaining employees would have no such protection.

The second is a misapprehension and conflation of two distinct features of the Plan — the early retirement subsidy and the QJSA provisions. ERISA requires that Defendants act in accordance with the Plan's ERISA-compliant terms. 29 U.S.C. § 1104(a)(1)(D). This includes the Plan's early retirement subsidy, which Plaintiffs do not challenge. Replacing the Plan's early retirement factors with 417(e) factors would not only violate the Plan's terms, but also ERISA. *Id.*

Both of Defendants' premises are contrary to ERISA's text and purpose and should be rejected. When Plaintiffs' alleged injuries are viewed in the proper statutory context, as pled in the SAC, Plaintiffs have standing.

---

benefit commencing at normal retirement age, … the employee's accrued benefit[] … shall be the actuarial equivalent of such benefit …." Thus, ERISA at times uses the term "accrued benefit" to refer to a benefit other than the annual benefit commencing at normal retirement age.

**C.    ERISA Requires that a JSA Must Be Actuarially Equivalent to an SLA Commencing as of the Same Date**

For actuarial equivalence under section 1055, the proper point of comparison is between the JSA on the date that the participant *actually commences benefits* and an SLA as of that same date. So held the only court to consider this issue in *Urlaub v. CITGO Petroleum Corp.*, 2022 WL 523129, at *6 (N.D. Ill. Feb. 22, 2022) ("the Court finds that section 1055 requires actuarial equivalence between JSAs and SLAs at the time of actual retirement"). That decision's statutory interpretation — not cited by Defendants — is squarely on point. The *Urlaub* plaintiffs, like here, alleged that JSAs determined using a mortality table published in 1971 violated ERISA's actuarial equivalence requirements. *Id.* at *2. The *Urlaub* plaintiffs, like here, brought claims under sections 1053, 1054, and 1055. *Id.* On a motion to dismiss, the *Urlaub* defendants, like here, argued that ERISA's definition of "accrued benefit" "requires actuarial equivalence between the plaintiffs' benefits and an SLA *at normal retirement* …." *Id.* (emphasis original). This argument, however, ignored the text of section 1055(d)(1), which does not use the term "accrued benefit" but instead requires that a JSA be "the actuarial equivalent of a single annuity for the life of the participant." *Id.* at *3 (quoting 29 U.S.C. § 1055(d)(1)). Rejecting the defendants' argument, *Urlaub* found that this statutory text, considered in conjunction with the purpose of ERISA, and consistent with its implementing regulations, "support[ed] the plaintiffs' interpretation that the proper point of comparison is between the JSA at the participant's actual retirement date and an SLA at that date." *Id*. at *5 (citing, *inter alia*, 26 C.F.R. § 1.401(a)-20 Q&A 16 ("In the case of a married participant, the QJSA must be at

11

least as valuable as any other optional form of benefit payable under the plan at the same time.")).

Just so here. When a participant commences benefits, whether at normal retirement age or otherwise, their JSA must be no less than the actuarial equivalent of their SLA as of the same date. The statute provides that JSAs are to be paid "*for the life of the participant*" with a survivor annuity for the spouse's life equal to a percentage of the annuity payable for the participant and spouse's joint lives. 29 U.S.C. § 1055(d)(1)(A), (d)(2)(A)(i) (emphasis added). And under the statute, JSAs must be the actuarial equivalent of the SLA "*for the life of the participant*." 29 U.S.C. § 1055(d)(1)(B), (d)(2)(A)(ii) (emphasis added). In this context, the phrase "for the life of the participant" means the period from the participant's retirement until the participant's death. *Urlaub*, 2022 WL 523129 at *3-6 (rejecting interpretation that "for the life of the participant" means "from age 65 to death").

The regulations interpreting section 1055 further support the conclusion that "actuarial equivalence under section 1055 requires a comparison between [plaintiffs'] JSAs at their actual (here, early) retirement date and the SLAs they would have received at that retirement date." *Id.* at *4. For example, 26 C.F.R. § 1.401(a)-11(b)(2) states that a "[QJSA] must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." An SLA is one optional form of benefit offered under the Plan; thus, a QJSA must be the actuarial equivalent of an SLA. *Urlaub*, 2022 WL 523129, at *3-4 (applying 26 C.F.R. § 1.401(a)-11(b)(2)); ECF No. 122 at 10 (describing an SLA as "an optional form of benefit" for married participants). Similarly, 26 C.F.R. § 1.401(a)-20 at Q&A-16 provides that, for married participants, "the

12

QJSA must be at least as valuable as any other optional form of benefit payable under the plan *at the same time*." (emphasis added); *see also* Altman Decl. ¶ 6. Thus again, the "proper point of comparison is between the JSA at the participant's actual retirement date and an SLA at that date." *Urlaub*, 2022 WL 523129, at *5 (applying 26 C.F.R. § 1.401(a)-20 at Q&A-16).[5]

Finally, requiring a JSA to be the actuarial equivalent of the SLA as of the benefit commencement date serves ERISA's purpose to prevent employers from giving married workers a lower pension than unmarried workers. *Boggs v. Boggs*, 520 U.S. 833, 843 (1997) ("The statutory object of the qualified joint and survivor annuity provisions, along with the rest of § 1055, is to ensure a stream of income to surviving spouses."); *Urlaub*, 2022 WL 523129, at *5. In application, Defendants' position forces a married worker who retires early to choose between (1) a more valuable pension benefit — an SLA — that might leave their spouse and children penniless were the worker to die, or (2) a JSA that is worth less than the SLA. This impossible choice is precisely the type of pernicious outcome that ERISA's equivalence requirement was intended to prevent. *See Urlaub*, 2022 WL 523129, at *5; *see also* Altman Decl. ¶¶ 7-8 (explaining that if plans were permitted to offset punitive JSA factors with generous early retirement subsidies, "non-married participants would receive the benefit of early retirement subsidies, while married participants would be penalized ....").

---

[5] Plaintiffs' expert Ian Altman confirms this conclusion based on his decades of experience in the actuarial field. Altman Decl. ¶ 12 ("Determining a JSA benefit is done as of benefit commencement date by converting an SLA to a JSA using reasonable actuarial assumptions.").

Rather than engage with the statutory structure and meaning of ERISA's actuarial equivalence rules, as the Court in *Urlaub* did, Defendants focus myopically on the term "accrued benefit"[6] to counterintuitively suggest that ERISA's requirement of actuarial equivalence considers only the value of a participant's SLA as calculated at *normal retirement age* compared to the value of the JSA as of their *actual benefit commencement date*, whether that is at, before, or after age 65. But this conclusion is not supported by relevant case law and does not make sense in the context of ERISA as a whole, ERISA's implementing regulations, or ERISA's purpose, as discussed in *Urlaub* and above. Indeed, Defendants' reading gives sections 1054(c)(3) and 1055(d) the same meaning. This Court should reject "an interpretation of a congressional enactment which renders superfluous another portion of that same law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (quotation marks omitted).

Perhaps most telling is Defendants' actual practice. When asking participants to choose their benefit elections, Defendants do not provide participants with the value comparison that they now argue is the *only* permissible comparison under ERISA. Instead, contrary to the position they have adopted for litigation purposes, Defendants do as ERISA actually contemplates: they provide each participant with a benefit election form that compares the value of various benefit options available to the participant *as of their actual*

---

[6] Accrued benefit is defined as "(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and[] … expressed in the form of an annual benefit commencing at normal retirement age[] …." 29 U.S.C. § 1002(23). Defendants place particular emphasis on the last clause of the definition, "commencing at normal retirement age." *Defs' Memo.* at 16 (quoting 29 U.S.C. § 1002(23)).

*benefit commencement date* to the value of the participant's SLA benefit as of *that same benefit commencement date.* ECF No. 122 at 4, 10; ECF No. 123 at 3; ECF No. 100-1 at 2. Only now, in response to Plaintiffs' claims, do Defendants suddenly argue that it is inappropriate to make this comparison.

Defendants provide a string cite of cases purporting to support their argument. *Defs' Memo.* at 16-17. But none of the cases stand for the extraordinary proposition that actuarial equivalence must be calculated with reference only to an age 65 retirement. None of those decisions construed the term "accrued benefit" in a case like this one, where Plaintiffs allege that a pension plan failed to provide JSA benefits that are the actuarial equivalent of an SLA as of the same benefit commencement date. And none hold that actuarial equivalence under ERISA only requires comparing the value of a participant's SLA at normal retirement age with the value of the JSA as of the date the participant actually commenced benefits.

For example, in *Atkins v. Nw. Airlines, Inc.*, 967 F.2d 1197 (8th Cir. 1992), plaintiffs were pilots who worked past the airline's normal retirement age and, as a result, did not take advantage of the pension plan's early retirement option. They claimed that under ERISA, 29 U.S.C. § 1054(b), the plan's "early retirement discount must be inverted into a late retirement bonus to account for the shorter period over which the accrued benefit would be paid." *Id*. at 1200. The *Atkins* panel affirmed summary judgment for defendants, reasoning that the pilots' position "may be a valid argument for the bargaining table, but it

is not required by ERISA." *Id*. at 1200. The case says nothing about the proper conversion of an SLA to a JSA under ERISA's actuarial equivalence rule.[7]

Similarly, in *Thole v. U.S. Bank*, *N.A.*, 873 F.3d 617 (8th Cir. 2017), *aff'd* 590 U.S. 538 (2020), plaintiffs brought fiduciary breach claims after a pension plan's portfolio that was 100% invested in equities lost $1.1 billion following the 2008 Financial Crisis. The decision merely quotes the section 1002(23) definition of "accrued benefit," and found no standing because plaintiffs to date had received the benefit payments they were entitled to under the Plan. *Id*. at 623. Like *Atkins*, *Thole* says nothing about the actuarial equivalence of JSA benefits, or forfeiture under section 1053. Defendants cite no other case which has interpreted ERISA as they do, in the context of claims regarding the ***actuarial equivalence of JSAs***. The other cases they rely on are inapposite and should be disregarded.[8]

### D.    The Early Retirement Factor Is ERISA Compliant and Not Challenged Here

Second, in service of their standing argument, Defendants conflate the early retirement factor and the actuarial assumptions used to determine Plaintiffs' JSAs by trying

---

[7] No other court considering claims regarding the actuarial equivalence of JSAs has cited *Atkins*, including in this District. *See, e.g.*, *Thorne v. U.S. Bancorp*, 2021 WL 1977126 (D. Minn. May 18, 2021) (denying class certification where, under each of plaintiffs' expert's models, some class members were not injured and thus lacked standing).

[8] *Tilley v. Mead Corp.*, 927 F.2d 756, 757 (4th Cir. 1991) (considering whether funds remaining in a terminated pension plan may revert to the employer prior to satisfaction of the plan's unreduced early retirement benefits); *Smith v. U.S. Bancorp*, 2019 WL 2644204, at *1 (D. Minn. June 27, 2019) (considering allegations that early retirement factors, not JSA factors, resulted in benefits that were not actuarially equivalent under section 1054(c)(3)); *Cattin v. Gen. Motors Corp.*, 955 F.2d 416, 422 (6th Cir. 1992) (finding, on a section 1054(g) claim, that "social security supplement" on early retirement was not an "accrued benefit"); *Engers v. AT&T*, 2002 WL 32159586, at *7 (D.N.J. Oct. 17, 2002) (finding "early retirement subsidy" in cash balance plan was not an "accrued benefit.").

to collapse the two separate calculations, made under two separate sets of Plan assumptions, into a single "benefit" calculation. Altman Decl. ¶ 18. Specifically, Defendants wrongly characterize Plaintiffs' claim this way: that "had their **benefits** 'been determined using reasonable actuarial assumptions (such as those set forth in 26 U.S.C. § 417(e)), [their] monthly pension payment[s] would be larger." *Defs' Memo.* at 18 (citing SAC ¶¶ 27-28) (emphasis added). But Plaintiffs allege that if their ***JSAs*** been determined using reasonable assumptions like those supplied by section 417(e), they would receive more money every month. *See* SAC ¶¶ 27-28, 56. Plaintiffs do not challenge the early retirement subsidy Defendants chose to award under the Plan terms because the early retirement subsidy appears to be higher than required by ERISA's statutory minimums.

In order to make a faulty argument that applying section 417(e) assumptions would result in a lower benefit for the early retirees, Defendants replace the Plan's unchallenged early retirement subsidy with the 417(e) factors to make a new, hypothetical and much lower early retirement SLA. Defendants then convert this new, artificially lowered early retirement SLA into a JSA using 417(e) JSA factors to replace the Plan's lower JSA conversion factors. So in Defendants' counterfactual calculation, while the JSA conversion factor rises, the increase in the SLA-to-JSA conversion is offset by improperly removing the Plan's unchallenged early retirement subsidy. Only by falsely[9] collapsing the

---

[9] Plaintiffs do not challenge the early retirement factor in the Plan because it is ERISA-compliant. For whatever reason, Ecolab decided to incentivize early retirement for its workforce by offering an early retirement benefit that is more favorable than it hypothetically would be if it were calculated using the actuarial assumptions set forth in section 417(e), and they are entitled to do so. *See Cent. Laborers' Pension Fund v. Heinz*,

distinction between the early retirement subsidy and the JSA conversion can Defendants argue that the actuarial equivalent of Plaintiffs' "accrued benefit" must be calculated using 417(e) assumptions for both the early retirement factor and the JSA factor regardless of the Plan's terms. *See Defs' Memo.* at 19-20 (first reducing each of Bennett's and Wilde's age-65 accrued benefit to an early commencement benefit using 417(e) factors and then converting the early commencement SLA to an early commencement JSA using 417(e) factors).

This is completely wrong. There is no allegation in the SAC[10] that the Plan's early retirement factor must be determined using the same mortality and interest rate assumptions as used for JSA factors. Rather, the SAC focuses on the JSA factor alone, alleging that "the actuarial assumptions applicable to [Plaintiffs'] joint and survivor annuities reduced [their] benefits to less than the actuarial equivalent value of their ERISA protected benefits expressed as the single life annuity at the same retirement date[.]…"). SAC at ¶ 98; *see also* Altman Decl. ¶ 18; *Urlaub*, 2022 WL 523129 at *4-6. Defendants likewise cite no requirement in the law for calculating an early retirement reduction using the same actuarial factors as are used to calculate the JSA, because there is no such requirement.

---

541 U.S. 739, 741-43 (2004) (holding that imposing new conditions on right to receive an accrued subsidized early retirement benefit violated ERISA). Mr. Sher's approach erases the early retirement subsidy provided under the Plan to falsely imply that Plaintiffs were unharmed. *See* Altman Decl. ¶ 17.

[10] Defendants may not revise Plaintiffs' complaint to serve their argument. *Royal Canin U. S. A., Inc. v. Wullschleger,* 604 U.S. 22, 35 (2025) ("The plaintiff is the master of the complaint[.]… She gets to determine which substantive claims to bring against which defendants.") (cleaned up).

Defendants' argument also ignores the Plan's terms, its implementation, and Ecolab's representations to participants. The Plan currently does not use any actuarial assumptions to calculate early retirement benefits but instead uses a "simple math formula" to calculate the SLA of a participant who retires before age 65. Altman Decl. ¶¶ 10-11. The early retirement factor is set forth in the Plan, in a separate section from the Plan terms governing conversion of an SLA to a JSA. *Id.* at ¶ 18; 2017 Plan Art. 4.5(D) (early retirement). In contrast, the JSA factor uses "interest and average life expectancy assumptions." ECF No. 122 at 10; *see also* 2017 Plan Art. 2 (defining actuarial equivalent) and Schedule B (providing actuarial assumptions).

Defendants' argument that the only proper comparison is between the benefits that Plaintiffs actually received and their age 65 SLAs is also contradicted by Defendants' own conduct. Defendants provided Plaintiffs Bennett and Wilde with benefit election forms that compared benefit payment options only as of their ***actual, early benefit commencement dates.*** ECF No. 122 at 4; ECF No. 123 at 3. For example, the first option on Bennett's benefit election form, the "Life Annuity," lists the monthly benefit amount that Bennett would have received if he elected to begin receiving an early retirement SLA benefit on December 1, 2014. ECF No. 122 at 4. The options that follow, including several JSA options, similarly provide the monthly benefit amount that Bennett would have received as of the same December 1, 2014, benefit commencement if he had selected such option. *Id.* Nowhere does the benefit election form provide any information about Bennett's age 65 SLA. *Id.* Defendants directed participants to compare the options set forth on their election forms. *See id.* at 10 ("The benefit amounts provided in the Payment Options section of the

19

Pension Options Election Form are all approximately equal in value to the Life annuity option."). Although Defendants correctly directed participants to compare the benefit options that were available to them as of their actual benefit commencement date, they falsely advised that these options were "all approximately equal in value to the Life annuity option." *Id.* at 10; *see* Altman Decl. ¶ 19 (showing each Plaintiff received a JSA benefit that was less than the actuarial equivalent of the SLA benefit that he could have received as of the same benefit commencement date). Defendants cannot now claim that the only appropriate comparison is to a participant's age 65 SLA.

Ultimately, Defendants do not refute the allegation that Plaintiffs' JSAs were not actuarially equivalent to their SLAs as of their respective benefit commencement dates. *See generally Defs' Memo.*; Sher Decl. Nor do they assert that each Plaintiff's JSA was at least equal to the most valuable form of benefit as of his benefit commencement date. *Id*. Instead, Defendants conjure up a requirement that is not found in the Plan's terms, not reflective of Defendants' conduct, not alleged in the SAC, and not found in law: applying 417(e) assumptions to the early retirement factor **and** the JSA factor. Only in this way can Defendants purport to establish that Plaintiffs are better off with the status quo and have suffered no loss. The Court should not be misled by this distortion of Plaintiffs' allegations because the early retirement factor is neither at issue nor legally relevant to the question of whether Bennett's and Wilde's JSAs are actuarially equivalent to their SLAs on their benefit commencement dates. *See Urlaub*, 2022 WL 523129 at *4-6.

**E.    The Experts Agree: The JSA Factors Used to Calculate Plaintiffs' JSAs Resulted in Monthly Pension Payments that Are Less Than the Minimum ERISA Requires**

Because ERISA requires that JSA and SLA pension benefits be actuarially equivalent to each other at the time of a participant's benefit commencement, there can be no question that Plaintiffs Bennett and Wilde have shown Article III injury. Altman Decl. ¶ 13. Plaintiffs' and Defendants' respective experts agree that the assumptions the Plan actually used to calculate both Bennett's and Wilde's JSAs result in underpayment. This is seen in the lower JSA conversion factors the Ecolab Plan used:

- Bennett: **0.9140** (Plan's factor) vs. **0.9353** (417(e) assumption);

- Wilde: **0.8455** (Plan's factor) vs. **0.8803** (417(e) assumption).

*Id*. at ¶¶ 14, 19 (Bennett) and ¶¶ 15, 19 (Wilde); *see also* Sher Decl. at ¶¶ 11-12, 18 (Bennett) and ¶¶ 23-24, 28 (Wilde). A lower JSA factor leads to a correspondingly lower monthly pension payment:

- Bennett: **$1,323.55** (using Plan's factor) vs. **$1,354.40** (using 417(e));

- Wilde: **$5,032.86** (using Plan's factor) vs. **$5,240.01** (using 417(e)).

Altman Decl. ¶ 19; *cf.* Altman Decl. ¶ 17 ("[A] higher conversion factor leads to a higher JSA."). Stated another way, Bennett is receiving 2.33% less than he is entitled to every month under ERISA, *id*. at ¶ 14, and Wilde is receiving 4.12% less. *Id*. at ¶ 15. These are concrete, ongoing injuries to Plaintiffs Bennett and Wilde resulting from Defendants' failure to use reasonable actuarial assumptions to determine their JSAs, sufficient to confer standing to assert claims under section 1053 and section 1055. *See Thole*, 590 U.S. at 542; 29 U.S.C. § 1053(a); 29 U.S.C. § 1055(a)-(d); SAC at Counts I and III.

## II.    THE SAC PROPERLY ALLEGES ERISA VIOLATIONS

### A.    Rule 12(b)(6) Legal Standard

A complaint survives a motion to dismiss under Rule 12(b)(6) where it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard is met if the "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In evaluating the claims in a complaint, "the court must take the plaintiff's factual allegations as true." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Further, "the complaint should be read as a whole, not parsed piece by piece[.]" *Id.*[11]

### B.    The SAC Plausibly Alleges that Defendants Violated Sections 1053, 1054, and 1055 by Using Outdated Actuarial Assumptions to Calculate Statton's JSA Benefit

Defendants argue that Statton's section 1053, 1054, and 1055 claims should be dismissed because the SAC does not allege the amount of Statton's accrued benefit. *Defs'*

---

[11] Although Defendants "do not raise it as a ground for dismissal," they argue that ERISA does not require the use of reasonable actuarial assumptions. *Defs' Memo.* at 26 n.5. They are wrong. *See, e.g.*, *Hamrick v. E.I. du Pont de Nemours & Co.*, 2024 WL 359240, at *4 (D. Del. Jan. 31, 2024), *report and recommendation adopted*, 2024 WL 2817966 (D. Del. June 3, 2024); *Urlaub*, 2022 WL 523129, at *6; *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742, 753 (D. Minn. 2022); *Masten v. Metro. Life Ins. Co.*, 543 F. Supp. 3d 25, 34-35 (S.D.N.Y. 2021); *Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912, 924 (E.D. Wis. 2020); *Herndon v. Huntington Ingalls Indus., Inc.*, 2020 WL 3053465, at *2 (E.D. Va. Feb. 20, 2020); *Smith v. U.S. Bancorp*, 2019 WL 2644204, at *3 (D. Minn. June 27, 2019).

*Memo.* at 26-29. Defendants' argument that the SAC states plausible claims only if it uses the magic words "accrued benefit" is contrary to law and should be rejected.

"[T]he *Twombly/Iqbal* 'plausibility' standard does not require magic words or detailed facts in most cases." *Agredano v. State Farm Lloyds*, 975 F.3d 504, 506 (5th Cir. 2020); *see Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 544 (1st Cir. 2021) (explaining a plaintiff need not "intone some catechism of magic words" to avoid dismissal); *Ryan v. Blackwell*, 979 F.3d 519, 524-25 (6th Cir. 2020) ("There is no reason to think that there are some magic words Ryan would have needed to use to assert his due process rights."); *Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of Am., Inc.*, 2012 WL 5439170, at *4 (D. Minn. Nov. 7, 2012) ("But there are no magic words that the Commission must plead[] ...."). Imposing a magic-words requirement would be inconsistent with Rule 8. *Frye v. Hamilton Cnty. Hosp.*, 2018 WL 11228546, at *8 (N.D. Iowa Nov. 1, 2018); *see also* Fed. R. Civ. P. 8(d)(1), (e) (confirming "[n]o technical form is required" and providing that pleadings "must be construed so as to do justice"). Thus, courts should instead "focus on the substance of the allegations to avoid making pleading a formalistic headache." *Stanton v. Elliott*, 25 F.4th 227, 238 (4th Cir. 2022); *see Knapp v. City of Columbus*, 93 F. App'x 718, 720 (6th Cir. 2004) ("The court's duty is to look to the facts and grant the necessary relief as justice requires—not to demand that certain citations or phrases are used.").

Here, the SAC's allegations state plausible statutory-violation claims. The SAC alleges that the Plan uses outdated actuarial assumptions to determine the amount of participants' JSA benefits and thus unlawfully fails to pay married retirees benefits that

have an equivalent economic value as those paid to single retirees. SAC at ¶¶ 15-20, 62-67, 97-99, 107-08, 116-17. Statton elected a JSA and began receiving his pension benefit after retiring at age 66. *Id.* at ¶ 29. Statton's monthly JSA payment was determined using outdated assumptions about participants' and beneficiaries' longevity. *Id.* As a result, Statton, like Bennett and Wilde, suffered harm from Defendants' use of outdated and unreasonable actuarial assumptions to determine his monthly JSA and will continue to experience a pension shortfall every month. *Id.* at ¶¶ 27-29, 68-71. Taken together, these allegations raise a reasonable inference that Defendants are liable for paying Statton a JSA benefit that is less than that which he has earned in violation of sections 1053, 1054, and 1055.

Defendants' argument ignores simple arithmetic. To convert an SLA benefit to a JSA benefit, the SLA benefit amount is multiplied by a conversion factor. The SAC alleges that "the actuarial assumptions applicable to Class members' [JSAs] reduced Class members' benefits to less than the actuarial equivalent value of their ERISA protected benefits expressed as the [SLA] at the same retirement date." SAC at ¶ 98. In other words, the JSA conversion factor that the Plan used was less than ERISA requires. Using simple math, any SLA benefit amount that is multiplied by a conversion factor that is less than ERISA requires will result in an unlawfully reduced JSA benefit. *See also* Altman Decl. ¶¶ 14-19 (explaining that "Mr. Sher concedes the fact that the Plan's actuarial assumptions

lead to a lower JSA conversion rate[]" and showing how these conversion rates reduced Plaintiffs' JSA benefits).[12]

The SAC properly alleges Statton's section 1055 claim. Section 1055 requires that the JSA a participant receives as of his retirement date be no less than the actuarial equivalent of the SLA he would have received as of the same date. 29 U.S.C. § 1055(d). The SAC alleges that Defendants used an outdated and unreasonable JSA conversion factor, which caused Statton to receive a JSA that was less than the actuarial equivalent of the SLA that Statton could have received as of his actual retirement date. SAC at ¶¶ 29, 62-67, 70, 94-104. Thus, the SAC plausibly alleges that Defendants violated section 1055 by failing to provide Statton a JSA that was actuarially equivalent to his SLA.

The SAC also alleges a proper section 1054 claim. Section 1054 requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, … the employee's accrued benefit[] … shall be the actuarial equivalent of such benefit …." 29 U.S.C. § 1054(c)(3). As relevant here, section 1054 requires that Statton's age 66 JSA must be the actuarial equivalent of his age 65 SLA. *Id.*; SAC at ¶ 107. The SAC alleges that Defendants' use of an outdated and unreasonable JSA conversion factor caused Statton to receive a JSA that was less than the actuarial equivalent of the SLA that Statton could have received at age 65. SAC at ¶¶ 29, 70-74,

_____

[12] Moreover, Statton's benefit election form, which Defendants agree is incorporated into the SAC, *Defs' Memo.* at 25-26, shows that Statton's SLA benefit amount was $1,752.59. ECF No. 100-1 at 2; *see also* ECF No. 124 at 2. Statton's benefit election form further shows that he selected the 100% JSA benefit, and Defendants applied a factor of 0.8045, resulting in a monthly benefit of $1,409.96. ECF No. 100-1 at 2; *see also* ECF No. 124 at 2.

105-08. Under the Plan, "[i]f a Participant is entitled to a benefit commencing as of his or her Normal Retirement Date, but commences a benefit after attaining such Normal Retirement Date, … the Participant's benefit will be actuarially adjusted for late commencement" unless retroactive benefits are elected. 2017 Plan at § 4.3(E); ECF No. 121-3, Ecolab Pension Plan, 2012 Revision ("2012 Plan") § 4(F) (same). In other words, Statton's age 65 SLA benefit was converted into an actuarially equivalent age 66 SLA to account for the fact that he retired about one year after his normal retirement age, and then his benefit was converted into a JSA using an outdated and unreasonable JSA conversion factor which caused his age 66 JSA to be less than the actuarial equivalent of his age 65 SLA in violation of section 1054. Thus, the SAC plausibly alleges that Defendants violated section 1054 by failing to provide Statton a JSA that was the actuarial equivalent of his age 65 SLA.

The SAC properly alleges Statton's section 1053 claim. Section 1053 requires pension plans to provide that "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age …." 29 U.S.C. § 1053(a). The Treasury regulation, 26 C.F.R. § 1.411(a)-4(a), "defines the term 'nonforfeitable'" and provides that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." The SAC alleges that Defendants' use of outdated and unreasonable JSA conversion factors caused Statton to receive a JSA that was less than the actuarial equivalent of his age 65 SLA and his age 66 SLA. SAC at ¶¶ 29, 70-74, 94-122. Because the SAC alleges that the reductions made to convert Statton's benefit to a JSA were in

excess of reasonable actuarial reductions, the SAC plausibly alleges that Defendants violated section 1053.

Because the SAC plausibly alleges that Defendants violated ERISA by using outdated and unreasonable actuarial assumptions to calculate Statton's JSA benefit, Defendants' motion to dismiss Statton's section 1053, 1054, and 1055 claims should be denied.

**C.    Plaintiffs' Breach of Fiduciary Duty Claims Challenge Fiduciary Conduct**

Defendants next argue that Plaintiffs' claims that "the Plan Administrator breached its fiduciary duties under ERISA when applying the Plan's actuarial assumptions and in failing to ensure that those actuarial assumptions conformed to ERISA's requirements" should be dismissed because it does not challenge fiduciary conduct. *Defs' Memo.* at 29. Wrong again. *See Urlaub v. CITGO Petroleum Corp.*, 750 F. Supp. 3d 863, 876-77 (N.D. Ill. 2024) (denying summary judgment on breach-of-fiduciary-duty claim).

There are two types of ERISA fiduciaries: (1) named fiduciaries, which are named by the plan and have the authority to control and manage the operation and administration of the plan, 29 U.S.C. § 1102(a); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993); and (2) functional fiduciaries, which includes anyone who exercises discretionary authority or control respecting plan management, exercises authority or control respecting management or disposition of plan assets, renders investment advice for a fee (or has authority or responsibility to do so), or has discretionary authority or responsibility in the administration

of the plan. 29 U.S.C. § 1002(21)(A); *Su v. BCBSM, Inc.*, 2024 WL 3904715, at *5 (D. Minn. Aug. 22, 2024).

The SAC clearly alleges that the Plan Administrator is a named fiduciary. SAC ¶¶ 34-35 (alleging that the Plan Administrator is the Administrator and a Named Fiduciary according to the Plan Document); *see also* 2017 Plan § 10.1; *but see* 2012 Plan §§ 10.1-10.3 (naming Ecolab as the Named Fiduciary but assigning fiduciary duties to the Administrator). Nothing more is required at the pleading stage to establish that the Plan Administrator acted as a fiduciary.

"[T]he Supreme Court has itself recognized that, as logic would suggest, a named fiduciary is 'an ERISA fiduciary.'" *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 277 (4th Cir. 2019) (quoting *Mertens*, 508 U.S. at 251). The Fourth Circuit explained:

> To the extent that our decisions have said that "being a fiduciary under ERISA is not an all-or-nothing situation," our Court has never done so in the context of assessing whether a plan administrator and a named fiduciary is, in fact, a fiduciary....
>
> Our precedents should not, however, be unduly expanded to suggest that an entity that serves as both the plan administrator and the named fiduciary for an ERISA-covered plan is *not* an ERISA fiduciary. Doing so would ignore ERISA's undisputable recognition of named fiduciaries.

*Id.* (footnote omitted); *see Nelsen v. Principal Global Investors Tr. Co.*, 362 F. Supp. 3d 627, 636 (S.D. Iowa 2019) (reaching a similar conclusion where defendants cited caselaw involved functional fiduciaries, not named fiduciaries). "Put succinctly, a participant or beneficiary is generally not required to allege that the plan administrator and named fiduciary also satisfies the functional fiduciary test in order to state a plausible fiduciary

breach claim against it under ERISA." *Dawson-Murdock*, 931 F.3d at 278; *see also McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) ("Because Principal is not a named fiduciary of the plan, McCaffree needed to plead facts demonstrating that Principal acted as a fiduciary 'when taking the action subject to complaint.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004) (explaining that "courts will typically have insufficient facts at the motion to dismiss stage from which to make the law/fact analysis necessary to determine functional or named fiduciary status").

Moreover, the SAC alleges that the Plan Administrator engaged in fiduciary conduct. The SAC alleges that the Plan Administrator was the Named Fiduciary for all respects other than investment matters and that the Plan Administrator was responsible for calculating and paying benefits. SAC ¶¶ 35, 74-75, 124-26. The Plan gives the Plan Administrator "the power and discretion to make all determinations necessary for administration of the Plan, except those determinations that the Plan requires others to make, and to construe, interpret, apply and enforce the provisions of the Plan, including the power to remedy ambiguities, inconsistencies, omissions and erroneous account balances." 2017 Plan § 10.6(A); *see* 2012 Plan § 10.2 (granting similar authority).[13] The Plan further empowers the Plan Administrator to prescribe the manner in which participants apply for benefits, to determine participants' eligibility for benefits, and to control the payment of benefits by giving instructions to the Trustee. 2017 Plan §§ 7.8(A),

---

[13] The parties agree that the Court may consider Plan documents and benefit election forms as such documents are incorporated by reference into the SAC. *Defs' Memo.* at 25-26.

10.6(C), 10.12; 2012 Plan §§ 7.8, 10.9 (granting similar authority). If the Plan Administrator determines that a benefit was incorrectly determined for any reason, "the Administrator may take such action as he or she deems appropriate to correct such error, including, but not limited to, causing an additional distribution to be made from the Plan[] …." 2017 Plan § 10.14(B); 2012 Plan § 10.12(B) (same). Under these circumstances, it cannot be disputed that the Plan Administrator is a fiduciary within the meaning of ERISA. *See Slabaugh v. Beurmann-Marshall Corp.*, 1988 WL 796658, at *4 (W.D. Mich. May 31, 1988) (finding fiduciary status under similar circumstances).

A person is "a fiduciary to the extent it exercised **any** authority or control over the plans' assets, regardless of whether that authority or control was discretionary." *BCBSM*, 2024 WL 3904715, at *5 (emphasis in original); *see FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) ("Note that this section imposes fiduciary duties only if one exercises *discretionary* authority or control over plan *management,* but imposes those duties *whenever* one deals with plan *assets.*") (emphasis in original); 29 U.S.C. § 1002(21)(A)(i). The Plan Administrator exercised control over the Plan's assets when it instructed the Trustee to make distributions and pay benefits. *See IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997) ("The words of the ERISA statute, and its purpose of assuring that people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries, require that a person with authority to direct payment of a plan's money be deemed a fiduciary."). Thus, the Plan Administrator was engaged in fiduciary conduct when it instructed the Trustee to pay participants who elected JSAs benefit amounts that were less than that which ERISA requires.

The Plan Administrator also engaged in fiduciary conduct when it conveyed information about participants' benefits. In *Varity Corporation*, "the [Supreme] Court concluded that '[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power "appropriate" to carrying out an important plan purpose,' and thus qualifies as a fiduciary act." *White v. Aetna Inc.*, 2017 WL 11633693, at *6 (C.D. Cal. Oct. 18, 2017) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996)); *see Christensen v. Qwest Pension Plan*, 462 F.3d 913, 917 (8th Cir. 2006) (explaining that it is a breach of the duty of loyalty to "knowingly cause a plan beneficiary to retire based on materially overstated benefit estimates[]"). The SAC alleges that the Plan Administrator disloyally and knowingly provided inaccurate and misleading information to Plan participants by misrepresenting that the JSAs were the actuarial equivalent of the participant's SLA and by failing to tell Plan participants that the JSAs were less valuable than the SLAs. SAC at ¶¶ 76-82, 128; ECF No. 122 at 10 (explanation of retirement benefit form stating "[t]he benefit amounts provided in the Payment Options section of the Pension Option Election Form are all approximately equal in value to the Life annuity option."). Thus, the SAC challenges the Plan Administrator's fiduciary conduct.

The Plan Administrator engaged in fiduciary conduct when it misleadingly told participants that the JSAs were approximately equal to the SLA option and when it instructed the Trustee who to pay and in what amount. The Plan Administrator, as "a fiduciary[,] is not allowed to violate ERISA merely because language in a plan document allows it." *McManus v. Clorox Co.*, 2025 WL 732087, at *4 (N.D. Cal. Mar. 3, 2025); *see*

31

*Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995) ("reject[ing] defendants' argument that the Plan provisions left them no discretion to diversify" because such a plan provision violates ERISA's purposes), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) ("the duty of prudence trumps the instructions of a plan document"); *Franklin v. Duke Univ.*, 2024 WL 1740479, at *5 (M.D.N.C. Apr. 23, 2024) (collecting cases); *Pender v. Bank of Am. Corp.*, 756 F. Supp. 2d 694, 704 (W.D.N.C. 2010) ("A fiduciary has a duty to ignore a plan term that is inconsistent with ERISA if implementing that term is contrary to a participant's interest."), *aff'd sub nom. McCorkle v. Bank of Am. Corp.*, 688 F.3d 164 (4th Cir. 2012); *Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 184 (E.D.N.Y. 2005) ("Of course, a trustee may not hide behind the terms of the trust documents to protect himself from liability where there is an inherent inconsistency between a provision in a plan document and a fiduciary duty expressed elsewhere in ERISA." (quotation omitted)), *aff'd,* 199 F. App'x 29 (2d Cir. 2006). The Plan empowered the Plan Administrator to take any action he or she deemed appropriate to correct any error in a benefit determination, including causing an additional distribution to be made from the Plan, yet the Plan Administrator took no action and instead continued to knowingly provide inaccurate and misleading information to participants and instruct the Trustee to pay unlawfully reduced JSA benefits. 2017 Plan § 10.14(B); 2012 Plan § 10.12(B); SAC at ¶¶ 76-82, 128; ECF

No. 122 at 10. The SAC properly alleges that the Plan Administrator breached its fiduciary duties.[14]

### D.    Count IV is Timely.

ERISA allows a breach of fiduciary duty claim to be filed within "six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113(1). Because Count IV alleges breaches of Defendants' ongoing duties to ensure that the Plan comports with ERISA and to avoid misleading Plan participants, Plaintiffs' claims are timely as to all events that occurred within six years of the date this lawsuit was originally filed. *See Wildman v. Am. Century Servs., LLC*, 237 F.

---

[14] Defendants' footnote challenge to Plaintiffs' breach of loyalty claim, *Defs' Memo.* at 36 n.12, should also be rejected. As explained in Section II.D, the claim is timely. Contrary to Defendants' argument, Plaintiffs' disloyalty claim does not hinge on their prudence-based allegations. Rather, Plaintiffs plausibly allege that the Plan Administrator disloyally and knowingly provided inaccurate and misleading information to participants and knowingly reduced participants' pension benefits by applying outdated, unreasonable assumptions that "enabled Ecolab, as Plan Sponsor, to save money by reducing the amount it contributed and contributes to the Plan to fund benefits." SAC ¶¶ 76-82, 128. This is sufficient to plead breach of loyalty. *See Varity Corp.*, 516 U.S. at 506 (explaining that knowingly deceiving beneficiaries to save the employer money is not acting in participants' and beneficiaries' sole interest); *Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1025 (8th Cir. 2022) ("Making materially misleading statements constitutes a violation of a fiduciary's duties of loyalty and prudence."); *Randall*, 2024 WL 713997, at *7 (concluding the amended complaint adequately alleged breach of loyalty where it contained enough factual content to conclude the plan sponsor and its CEO acted as fiduciaries, breached their duty of loyalty by redirecting preferred stock dividends for the employer's benefit, and the breach harmed the Plan and its participants); *McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 2011 WL 4455994, at *5 (D.N.J. Sept. 23, 2011) (concluding that breach of loyalty claim based on fiduciary's calculation of benefits survived dismissal where plaintiff alleged fiduciary used a database knowing it would result in the underpayment of benefits).

Supp. 3d 918, 924 (W.D. Mo. 2017) ("The duties of a fiduciary are ongoing, and a cause of action arises under ERISA each time the fiduciary breaches its duty.").

Applying ERISA's statute of limitations requires "considering the nature of the fiduciary duty" breached. *Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015). Defendants assert that the alleged breach of fiduciary duty occurred "when the Plan's actuarial assumptions were applied to determine each Plaintiff's JSA benefit, which happened no later than the date on which each Plaintiff commenced his benefits." *Defs' Memo.* at 31. Not so. In addition to alleging breach through application of outdated and unreasonable actuarial assumptions, Plaintiffs allege that the Plan Administrator breached its fiduciary duties by, *inter alia*, providing inaccurate and misleading information to Class members, failing to ensure that all benefits are paid in conformity with ERISA's requirements, and failing to update the actuarial assumptions applied to Class members' benefits. SAC ¶ 128. The last action constituting a part of the breach occurred the last time the Plan Administrator provided misleading information, failed to ensure that the Plan complied with ERISA, or applied Plan terms that violated ERISA to any Plaintiff.[15]

There were instances of each of these alleged breaches within six years of February 21, 2024, when the suit was filed. ECF No. 1. For example, in 2020 the Plan was amended

---

[15] Defendants cite *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017) ("*CalPERS*") for the proposition that "statutes of repose begin to run on the date of the last culpable act or omission of the defendant." *Defs' Memo.* at 31. *CalPERS* was not an ERISA case and did not consider when the clock begins under 29 U.S.C. § 1113. In any event, Defendants fail to explain why their "last culpable act or omission" was the date on which each Plaintiff commenced benefits, despite Plaintiffs' much broader allegations. *CalPERS* does not support Defendants' position.

to use updated mortality tables for some, but not all, participants; the Plan administrator's failure to ensure that the Plan complied with ERISA for all participants at that time was a breach. SAC ¶¶ 13-16, 78-79. All three of the named Plaintiffs were affected by this, and thus Count IV is timely. *See Morin v. Essentia Health*, 2017 WL 4083133, at *7 (D. Minn. Sept. 14, 2017) (holding that claim for breach of a continuing duty was timely because the last breach occurred within six years of suit) (citing *Tibble*).

Contrary to Defendants' assertion, Plaintiffs **do** contest that Bennett's claim is untimely. Defendants raised the timeliness of Bennett's claim in their original Motion to Dismiss, ECF No. 24 at 27-29, to which Plaintiffs never responded because they filed a First Amended Complaint as of right. ECF No. 32. Defendants again moved to dismiss the First Amended Complaint, but before the Court ruled on that motion, Plaintiffs filed the current, operative Second Amended Complaint, ECF No. 114, which "super[s]edes" the prior complaint and "renders [it] without legal effect." *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000). Count IV of the SAC is timely as to Bennett (and all Plaintiffs) because "the last action which constituted a part of the breach or violation" occurred in 2020 or later.

Moreover, Wilde's and Statton's claims are timely because—as this Court has already determined—they relate back to the initial Complaint. ECF No. 113 at 6-7 n.1 ("Because Statton's claims are identical to the claims already brought by Bennett and Wilde, and because Ecolab was already on notice that it may have to defend itself against a class of similarly situated individuals, no unfair prejudice results from permitting relation back in this case."). An amended complaint "relates back if the defendant knew or should

35

have known that it would be called on to defend against claims asserted by the newly-added plaintiff, unless the defendant would be unfairly prejudiced in maintaining a defense against the newly-added plaintiff." *Plubell v. Merck & Co.*, 434 F.3d 1070, 1072 (8th Cir. 2006) (quotation omitted). Where an amended complaint asserts the same claims and simply adds named plaintiffs who were always members of the putative class, relation back applies. *Id*. at 1073. Here, the Plan Administrator had fair notice within the limitations period that it would be called to defend against the putative class's fiduciary breach claim. *See* ECF No. 1 at ¶¶ 75, 106-114. Wilde and Statton are members of the putative class. Thus, their claims are timely by virtue of the relation back doctrine. *See Engh v. SmithKline Beecham Corp*., 2007 WL 4179361, at *8 (D. Minn. Nov. 20, 2007) (permitting relation back where "Plaintiffs have done nothing more than move an absent class member into the role of a named class representative").

Defendants argue that relation back does not avail Plaintiffs because the original Complaint was untimely, *Defs' Memo.* at 32, 35. But as explained above, that is incorrect. Defendants further argue that relation back should not apply because section 1113(1) is a statute of repose. Plaintiffs do not concede that it is,[16] but in any event, relation back is still appropriate. *See, e.g.*, *Zavala v. Kruse*, 2023 WL 2387513, at *4 n.2 (E.D. Cal. Mar. 7, 2023) (concluding the relation back doctrine applied to an amendment that included new

---

[16] The Supreme Court has recently referred to the relevant period as both a statute of limitations and a statute of repose. *Compare Hughes v. Nw. Univ*., 595 U.S. 170, 175 (2022) (referring to the period for fiduciary breach claims as "the 6-year statute of limitations"), *with Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 180 (2020) ("We have referred to § 1113(1) as a statute of repose….").

plaintiffs and newly named defendants even if 29 U.S.C. § 1113 was a statute of repose). The cases cited by Defendants, *CalPERS* and *Police & Fire Ret. Sys. Of City of Detroit v. IndyMac MBS, Inc*., 721 F.3d 95, 109 (2d Cir. 2013), did not involve § 1113 and are distinguishable. In *IndyMac MBS*, the court held that the relation back doctrine does not permit new plaintiffs to intervene "in order to revive claims that were dismissed from the class complaint for want of jurisdiction." 721 F.3d at 110. Here, Count IV was never dismissed for want of jurisdiction (and  Wilde and Statton do not seek intervention; Plaintiffs sought and received permission to file the SAC naming them). *CalPERS* did not consider relation back; it held that *American Pipe* tolling did not apply to the securities statute at issue. Relation back is different from equitable tolling, as it leaves the repose period intact and stems from a Federal Rule of Civil Procedure, not equity. *See Se. Penn. Transp. Auth. v. Orrstown Fin. Servs. Inc*., 12 F.4th 337, 349 (3d Cir. 2021). Defendants' argument that allowing relation back as to Wilde's and Statton's claims would violate the Rules Enabling Act also fails. *Id.* at 350-51 (holding that the Rules Enabling Act permits relation back for amendments outside of a repose period "because statutes of repose create a deadline for filing actions, rather than resolving them."). *See also United States ex rel. Osinek v. Permanente Med. Grp., Inc*., 2022 WL 16925963, at *15-17 (N.D. Cal. Nov. 14, 2022) (citing *Orrstown* and allowing 2022 amendment regarding conduct that occurred in 2009, even if 10-year limitations period was a statute of repose).

Defendants unsuccessfully attempt to distinguish *Orrstown* (which they refer to as "*SEPTA*") on the ground that the amended pleading there did not seek to add a new plaintiff.  *Defs' Memo.* at 35. Although the Third Circuit "d[id] not reach whether a plaintiff

may use relation back in this context to add new parties," 12 F.4th at 350, its analysis supports relation back here. And Defendants completely ignore *Plubell*, which is binding Eighth Circuit authority. *See* ECF No. 113 at n.1 (discussing *Plubell*). Thus, the Court should hold that relation back applies. Count IV is timely as to all Plaintiffs.

## CONCLUSION

Defendants' Motion to Dismiss the Second Amended Complaint should be denied.

Dated: August 27, 2025          **NICHOLS KASTER, PLLP**

s/Brock J. Specht
Paul J. Lukas, MN Bar No. 022084X
Brock J. Specht, MN Bar No. 0388343
Elizabeth M. Binczik, MN Bar No. 0398233
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
plukas@nka.com
bspecht@nka.com
ebinczik@nka.com


**FEINBERG, JACKSON, WORTHMAN & WASOW, LLP**

Mary Bortscheller, MN Bar No. 0399634
2112 Broadway Street NE
Suite 225, #137
Minneapolis, MN 55413
Telephone: 510-606-5129
mary@feinbergjackson.com

Todd Jackson (Cal. Bar. No. 202598)*
Nina Wasow (Cal. Bar. No. 242047)*
2030 Addison Street Suite 500
Berkeley, CA 94704
Telephone: 510-269-7998

38

Facsimile: 510-269-7994
todd@feinbergjackson.com
nina@feinbergjackson.com

*admitted pro hac vice*

*Counsel for Plaintiffs and the proposed Class*